UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
FILED

APR 27 2021

NATHAN OCHSNER
CLERK OF COURT

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| vs. | § | CRIMINAL NO. B-19-673 |
| ROEL ALANIS | § | |

## PLEA AGREEMENT

The United States of America, by and through its attorneys JENNIFER B. LOWERY, Acting United States Attorney for the Southern District of Texas, and the undersigned Assistant United States Attorney, and the defendant, **ROEL ALANIS**, and the defendant's counsel, pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

1. The defendant agrees to plead guilty to Counts ONE and TWO of the indictment in this case. Count ONE of the indictment charges the defendant with CONSPIRACY TO COMMIT BRIBERY OF A PUBLIC OFFICIAL, in violation of Title 18, United States Code, §371. Count TWO of the indictment charges the defendant with BRIBERY OF A PUBLIC OFFICIAL, in violation of Title 18, United States Code, §201(b)(1)(C), and Title 18, United States Code, § 2 . The defendant, by entering this plea, agrees that he is waiving any right to have the facts that the law makes essential to the punishment either charged in the indictment, or proved to a jury or proven beyond a reasonable doubt.

2. As part of this agreement, the United States agrees to recommend *full credit for Acceptance of Responsibility, sentencing at the low end of the advisory guideline level the defendant scores, and a limit to 4 points under U.S.S.G. 2B1.1 with defendant to urge*

*Revised May 2019*

<u>a 2-point limit. Additionally, counts to run concurrent and remaining counts will be dismissed at time of sentencing.</u>

3. The penalty for a violation of Title 18, United States Code, Section <u>371</u>, is a maximum term of imprisonment of <u>5</u> years, a fine of up to $250,000.00, and a period of supervised release not to exceed <u>3</u> years. The penalty for a violation of Title 18, United States Code, Section <u>201(b)(1)(C)</u>, is a maximum term of imprisonment of <u>15</u> years, a fine of up to $250,000.00, and a period of supervised release not to exceed <u>5</u> years. The defendant also acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then the Defendant may be imprisoned for the entire term of supervised release without credit for time already served on the term of supervised release prior to such violation. The defendant is not eligible for parole for any sentence imposed.

4. The defendant will pay to the United States District Clerk a special assessment in the amount of one-hundred dollars ($100.00) per count of conviction, as required in Title 18, United States Code, Section 3013(a)(2)(A). The payment will be by certified check payable to United States District Clerk, Brownsville, Texas 78520.

5. The defendant understands that under the Sentencing Guidelines, the Court is permitted to order the defendant to pay a fine that is sufficient to reimburse the government for the costs of any imprisonment or term of supervised release, if any is ordered.

6. The defendant agrees that any fine or restitution imposed by the Court will be due and payable immediately, and defendant will not attempt to avoid or delay payment.

7. Defendant agrees to make complete financial disclosure by truthfully executing a sworn financial statement (Form OBD-500) prior to sentencing if he is requested to do so. In the event that the Court imposes a fine or orders the payment of restitution as part of the Defendant's sentence, the Defendant shall make complete financial disclosure by truthfully executing a sworn financial statement immediately following his sentencing.

8. Defendant recognizes that pleading guilty may have consequences with respect to his immigration status if he is not a citizen of the United States. Defendant understands that if he is not a citizen of the United States, by pleading guilty he may be removed from the United States, denied citizenship, and denied admission to the United States in the future. Defendant also recognizes that if he is a naturalized citizen, pleading guilty may result in loss of citizenship. Defendant's attorney has advised defendant of the potential immigration and/or denaturalization (loss of citizenship) consequences resulting from defendant's plea of guilty.





11.  Defendant is aware that Title 18, United States Code, § 3742, affords a defendant the right to appeal the conviction and sentence imposed. The defendant

knowingly and voluntarily waives the right to appeal the conviction and the sentence imposed, or the manner in which the sentence was determined. Additionally, the defendant is aware that Title 28, United States Code, § 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the conviction or sentence has become final. The defendant knowingly and voluntarily waives the right to contest his/her conviction or sentence by means of any post-conviction proceeding. If the defendant files a notice of appeal following the imposition of sentence, the government will seek specific performance of this provision. Nothing in the foregoing waiver of appellate and collateral review of rights shall preclude the defendant from raising a claim of ineffective assistance of counsel in an appropriate forum.

In exchange for the Agreement with the United States, Defendant waives all defenses based on venue, speedy trial under the Constitution and Speedy Trial Act, and the statute of limitations with respect to any prosecution that is not time barred on the date that this Agreement is signed, in the event that (a) Defendant's conviction is later vacated for any reason, (b) Defendant violates any provision of this Agreement, or (c) Defendant's plea is later withdrawn.

12. In agreeing to these waivers, defendant is aware that a sentence has not yet been determined by the Court. The defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he/she may have received from his/her counsel, the United States or the Probation Office, is a prediction, not a promise, did not induce his/her guilty plea, and is not binding on the United States, the Probation Office or the Court. The United States does not make any promise or representation concerning what sentence the defendant will receive. Defendant further

understands and agrees that the United States Sentencing Guidelines are "effectively advisory" to the Court. *United States v. Booker*, 125 S.Ct. 738 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated guideline range.

13. The Defendant understands and agrees that each and all waivers contained in the Agreement are made in exchange for the concessions made by the United States in paragraph 2 of this plea agreement.

14. The United States reserves the right to carry out its responsibilities under guidelines sentencing. Specifically, the United States reserves the right:

   (a)  to bring its version of the facts of this case, including its evidence file and any investigative files, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

   (b)  to set forth or dispute sentencing factors or facts material to sentencing;

   (c)  to seek resolution of such factors or facts in conference with defendant's counsel and the Probation Office; and,

   (d)  to file a pleading relating to these issues, in accordance with U.S.S.G. Section 6A1.2 and Title 18, U.S.C.§ 3553(a).

15. Defendant is aware that the sentence will be imposed after consideration of the United States Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, U.S.C. § 3553(a). Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense(s) to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge

after the Court has consulted the applicable Sentencing Guidelines. Defendant understands and agrees the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, or should the Court order any or all of the sentences imposed to run consecutively, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this plea agreement.

16. Defendant understands that by entering into this agreement, he/she surrenders certain rights as provided in this plea agreement. Defendant understands that the rights of a defendant include the following:

(a) If defendant persisted in a plea of not guilty to the charges, defendant would have the right to a speedy jury trial with the assistance of counsel. The trial may be conducted by a judge sitting without a jury if the defendant, the United States, and the court all agree.

(b) At a trial, the United States would be required to present witnesses and other evidence against the defendant. Defendant would have the opportunity to confront those witnesses and his/her attorney would be allowed to cross-examine them. In turn, the defendant could, but would not be required to present witnesses and other evidence on his/her own behalf. If the witnesses for defendant would not appear voluntarily, he/she could require their attendance through the subpoena power of the court.

(c) At a trial, defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. However, if the defendant desired to do so, he/she could testify on his/her own behalf.

17. If defendant should fail in any way to fulfill completely all of the obligations under this plea agreement, the United States will be released from its obligations under the plea agreement, and the defendant's plea and sentence will stand. If at any time defendant retains, conceals or disposes of assets in violation of this plea agreement, or

if defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then may move the Court to set aside the guilty plea and reinstate prosecution. Any information and documents that have been disclosed by defendant, whether prior to or subsequent to this plea agreement, and all leads derived therefrom, will be used against defendant in any prosecution.

18. This written plea agreement, consisting of nine pages, including the attached certifications of defendant and his/her attorney, constitutes the complete plea agreement between the United States, defendant and his/her counsel. No promises or representations have been made by the United States except as set forth in writing in this plea agreement. Defendant acknowledges that no threats have been made against him/her and that he/she is pleading guilty freely and voluntarily because he/she is guilty.

19. Any modification of this plea agreement must be in writing and signed by all parties.

_____
Defendant

APPROVED:

_____ 4/22/2021
Assistant U.S. Attorney

_____
Attorney for Defendant

## CERTIFICATION BY THE DEFENDANT

I have consulted with my counsel and fully understand all my rights with respect to the <u>charge(s)</u> pending against me. Further, I have consulted with my attorney and fully understand my rights with respect to the provisions of the <u>Sentencing Guidelines and Policy Statements</u> which may apply in my case. I have read this plea agreement and carefully reviewed every part of it with my attorney. I understand this agreement and I voluntarily agree to it.

_____      04/16/2021
Defendant     Date

## CERTIFICATION BY ATTORNEY

I have fully explained to the defendant, his rights with respect to the pending indictment/information. Further, I have reviewed the provisions of the Sentencing Guidelines and Policy Statements and I have fully explained to the defendant the provisions of those Guidelines which may apply in this case. I have carefully reviewed every part of this plea agreement with the defendant. To my knowledge, the defendant's decision to enter into this agreement is an informed and voluntary one.

_____      4/16/21
Counsel for Defendant     Date

*Revised May 2019*     9

## PLEA PACKET MEMO

DEFENDANT: **ROEL ALANIS**            CASE #: **B-19-673**

RECOMMENDATION for Defendant's plea to **COUNTS ONE and TWO, and WAIVER of certain APPELLATE RIGHTS**: <u>Acceptance of Responsibility, Low End of Advisory Guidelines, and a limit to 4 points under U.S.S.G. 2B1.1 with defendant to urge a 2-point limit. Additionally, counts to run concurrent and dismissal of Remaining Counts at time of sentencing.</u>

### FACT SUMMARY SHEET

On January 9, 2019, Immigration and Customs Enforcement (ICE) agents commenced a bribery investigation after receiving information that detention facility employees Exy Adelaida Gomez, Benito Barrientez, and others, were involved in a scheme obtaining and selling Immigration "Alien Detainee Roster Lists" of detainees housed at a detention facility to a private attorney for compensation.

Agents determined that "Alien Detainee Roster Lists" (Detainee Rosters) contain names, dates of birth, country of origin, and "A numbers" of alien detainees, as well as housing assignments. Detainee Rosters are law enforcement sensitive and are for official use only, intended to be utilized in practice and usage by facility employees in the course of their official duties. Removal of Detainee Rosters from ICE detention facilities is strictly prohibited, and employees are under a duty to safe-guard such lists.

ICE agents contacted Gomez, a Detention Officer employed by Management and Training Corporation (MTC) and assigned to the El Valle Detention Center (EVDC), an immigration detention facility located in Raymondville, Texas. MTC operates under contract with Immigration and Customs Enforcement (ICE) to detain alien immigrants awaiting disposition of immigration cases and/or removal from the United States. Gomez said she is assigned to the front central position overseeing logging visitors and unlocking doors to allow entry. Gomez stated that on January 4, 2019, she began communicating with Benito Barrientez who asked her to obtain "Alien Detainee Roster Lists" (Detainee Rosters) from EVDC Raymondville because he recently loss his direct access to such lists, and that he would provide the lists to ROEL ALANIS, a private attorney. Gomez added that Barrientez said he and Damian Ortiz had been receiving money from Alanis in exchange for the lists. Gomez said Barrientez initially offered her $300, but then $500; for $500, she provided the roster. Gomez said she had the bribe money at her residence; agents then went to her residence and seized the $500.

January 9, 2019 Incident (Count 2)-

On January 9th, Barrientez told Gomez he had discussed the matter with Ortiz and they were willing to pay her $500 for the list since she was "the one doing the job;" Gomez agreed. While at work as a detention officer at EVDC, Gomez obtained a copy of the

1

Detainee Roster, hid it in her purse, and took it out of the detention facility unnoticed. On this same day after work, Gomez met with Barrientez in Harlingen, Texas, where she provided the Detainee Roster to Barrientez and he gave her $500.

Agents later learned Barrientez provided the Detainee Roster to Ortiz who, as per instructions from ALANIS, provided it to an associate of ALANIS.

Continuing Investigation by ICE agents-

On this same date, Gomez agreed to cooperate with agents and contacted Barrientez. In a recorded call, Gomez informed Barrientez she had obtained a Detainee Roster from the Port Isabel Detention Center (PIDC) and was willing to provide it for $700. Barrientez said he was interested in the list but needed to speak with Damian Ortiz, but then agreed to meet with her later that evening. PIDC is an immigration detention facility operated by ICE and located in Los Fresnos, Texas. There, alien immigrants are detained while awaiting disposition of their immigration cases and/or removal from the United States.

Gomez met with Barrientez at a parking lot in Harlingen, Texas. Agents observed as Barrientez arrived and walked over to Gomez' vehicle. There he received the PIDC Detainee Roster and handed Gomez the money. Agents then detained Barrientez and recovered the roster from his possession and the money given to Gomez.

ICE agents then questioned Barrientez who stated he is a Classification Clerk employed by Management and Training Corporation (MTC) and assigned to the Willacy County Regional Detention Center (WCRDC) located in Raymondville, Texas. (Under contract with MTC, WCRDC houses federal inmates detained by ICE and by the United States Marshal's Service.) Barrientez stated he previously had access to WDRDC and EVDC detainee rosters but recently lost that access, therefore, Ortiz told him to reach out to others who might be able to obtain said rosters. He recruited Gomez for the task. Barrientez added that earlier in the evening, he had met with Gomez at a parking lot in Harlingen and gave her $500 in return for an EVDC Detainee Roster. Barrientez said he then gave the roster to Ortiz who was to give it to ROEL ALANIS, a private attorney. He added that he told Gomez he wanted her to provide rosters from PIDC, a much larger facility. Barrientez said he knew the rosters are sensitive classified documents not for public disclosure, and that he and Ortiz had been providing rosters to ALANIS about twice a month since February 2018, these were provided in different places such as tennis courts or restaurant parking lots in Willacy or Cameron County. Barrientez then also cooperated with agents in the investigation.

January 10, 2019 Incident-

In a recorded call, Barrientez informed Ortiz he had obtained a "receipt" for delivery from the Port Isabel Detention Center (PIDC) and was willing to provide it for payment. "Receipt" was the code word they used when referring to Detainee Rosters. Ortiz agreed to meet Barrientez at a Whataburger parking lot in Raymondville, Texas. On January 10, 2019, ICE agents observed as Ortiz arrived and entered Barrientez' vehicle. Ortiz

2

received the PIDC Detainee Roster and handed Barrientez $400. Agents then detained Ortiz and recovered the roster from his possession; and the money from Barrientez.

ICE agents questioned Ortiz who stated he is a Senior Program Director employed by Management and Training Corporation (MTC) and assigned to the WCRDC located in Raymondville, Texas. Ortiz stated that Alanis was interested in ICE detainees housed at EDVC to secure them as clients; therefore, he (Ortiz) recruited Barrientos, who worked in the "classification department" and had access to the Detainee Rosters. He said the rosters are sensitive classified documents not to be disclosed to the public. Ortiz said the previous night he had spoken to ALANIS who told him he (ALANIS) would pay $1,000 for the PIDC roster which he just picked up from Barrientez. Furthermore, that on the previous night (January 9th, Count Two), he obtained a Detainee Roster from Barrientez and paid $750 for it, and he then gave the list to ALANIS' associate as per instructions from ALANIS. Ortiz added that ALANIS is a friend since high school and on or about July 2018, ALANIS asked him to obtain rosters; and he (Ortiz) did so at different locations to include Willacy, Cameron, and Hidalgo Counties.

### Continuing Investigation as to ALANIS:

During the course of the investigation, ALANIS communicated by phone with cooperating defendants, and later, with HSI-OPR Harlingen undercover agents regarding monetary payments in exchange for Detainee Rosters. Between January 10th and January 14th, 2019, Ortiz communicated with ALANIS via text messaging regarding a PIDC detainee roster. ALANIS stated in text messages that he was interested in obtaining the roster and said he would pay Ortiz $1000 in exchange.

### January 10, 2019 Incident-

On January 14, 2019, ALANIS instructed Ortiz, via text, to meet in Weslaco, Texas, to conduct the exchange. Agents observed as Ortiz met with ALANIS at his residence in Weslaco. During the meeting, ALANIS took possession of a PIDC Detainee Roster and paid Ortiz $1,000.

On January 22, 2019, Ortiz again communicated with ALANIS via text messaging regarding a roster containing information of ICE detainees housed at EVDC. ALANIS stated in text messages that he was interested in obtaining the Detainee Roster and said he would pay for said roster. On this same day, Ortiz delivered an EVDC Detainee Roster to the ALANIS Law Firm in Weslaco. Later this same day, ALANIS communicated with Ortiz and instructed him to meet at a restaurant in Weslaco to discuss the exchange. Agents monitored the meeting. ALANIS discussed the Detainee Roster, and informed that monetary payment would be delivered later to Ortiz by ALANIS' associate. Later this same day, ALANIS text messaged Ortiz to inform that the payment would be delivered to his mailbox located in Weslaco, Texas, later that night. The following morning, agents retrieved a package containing $500 which Ortiz found in his mailbox.

3

On January 31, 2019, ALANIS informed Ortiz he had dropped off an advance payment for the next roster, and the money was under a flower pot at Ortiz' house. Agents retrieved $670 from under the flower pot at Ortiz' house.

Undercover Operation by HSI-OPR Agents:

On February 6, 2019, ALANIS communicated, via text, directly with an undercover HSI agent posing as Barrientez to coordinate a meeting with another supposed crooked detention officer to exchange a PIDC roster for payment. On this day, ALANIS also communicated with a second undercover HSI agent, posing as a detention officer from PIDC, and informed him a money payment was inside a wooden shed for sale at the Home Depot parking lot in Harlingen, Texas. ALANIS instructed the undercover agent to pick up the money and leave the PIDC Detainee Roster inside the shed. The undercover agent did as instructed and retrieved the $600 from inside the shed. Within minutes, a truck pulled up to the shed and a person retrieved the roster. Agents followed the truck to a house near ALANIS' residence in Weslaco. The truck is registered to ALANIS' friend.

Additional Investigation and Statements-

ICE agents obtained information from ALANIS' cell phone showing text messages between him, his associates, and Ortiz, discussing the Detainee Rosters and payments, and photos of several rosters delivered before the investigation began. Agents were able to locate photos of Detainee Rosters which ALANIS sent to his sister on August 21 and September 12, of 2018. Text messages from the days before and after, accompanying the photos, revealed their discussions.

Also, during later questioning of Barrientez, he said he began supplying the rosters to Ortiz and ALANIS in about mid-2017 after Ortiz proposed this to him as a way to make money from ALANIS, and eventually they were paid $500 per list which they divided. After stopping for a few months, he then continued in February 2018 to supply the rosters to Ortiz, and on some occasions to others associated with ALANIS. He estimated providing about 15 to 20 rosters.

Ortiz stated that between about August 2018 and January 2019, he delivered about 30 to 40 rosters to ALANIS or his associates. In return, he was paid $500 per roster which he split with Barrientez.

Conclusion:

Defendant ALANIS admits he was involved in a conspiracy to bribe, directly and indirectly (and by aiding and abetting) to corruptly give, and offer to give, money to public officials, to induce them to do acts in violation of official duty. ALANIS admits he was provided with Immigration Detainee Rosters containing law enforcement sensitive data such as names, dates of birth, country of origin, and "A numbers" of alien detainees, as well as housing assignments.

I agree the factual summary accurately represents my involvement in the crime to which I am pleading guilty and that the proposed plea agreement describes my plea agreement with the government. A complete written plea agreement may be attached.

_____
Defendant

_____
Counsel for Defendant

_____  4/22/2021
Assistant United States Attorney